Filed by ECF:
September 23, 2010

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------X

UNITED STATES OF AMERICA,

Ind. No. 07-736 (S-3)(FB)

v.

ARTHUR DOZORTSEV,

Defendant.

-----------------------------X


**SENTENCING MEMORANDUM SUBMITTED
FOR DEFENDANT ARTHUR DOZORTSEV**


Edward V. Sapone, Esq. (ES-2553)
Attorney for Defendant
Arthur Dozortsev
40 Fulton Street, 23rd Floor
New York, New York 10038
Telephone: (212) 349-9000
Facsimile: (212) 349-9003
E-mail: edward@saponelaw.com

I.    Introduction

I offer this memorandum to Your Honor for Defendant Arthur Dozortsev who is scheduled to be sentenced on September 29, 2010, at 4:00 p.m.

Mr. Dozortsev will be sentenced upon his plea of guilty to a money laundering conspiracy and health care fraud.  The United States Attorney's Office and Mr. Dozortsev believe that Mr. Dozortsev's adjusted sentencing guidelines offense level is 15, in a Criminal History Category I, reflecting an advisory range of incarceration of 18 to 24 months.

Mr. Dozortsev's plea agreement, however, allows Mr. Dozortsev to ask Your Honor for a non-guidelines, or variance, sentence.

Having been counsel to Mr. Dozortsev for the last two years and eleven months, and having consulted the factors of 18 U.S.C. § 3553(a) in light of *United States v. Booker*, I respectfully suggest to Your Honor that a guidelines sentence would be "greater than necessary" to achieve the goals of sentencing. Instead, I ask the Court to impose upon Mr. Dozortsev a variance sentence of five years probation, 250 hours of community service, forfeiture of the assets listed in his plea agreement

(*See* Exhibit A), and restitution in the amount of $10,000.[1]

The Court's consideration of this memorandum is appreciated by Mr. Dozortsev and his family.  We also look forward to addressing the Court at the sentencing hearing, and, if permitted, offering brief oral statements from Mr. Dozortsev's father and his parish priest.


II.  Case History

On October 15, 2007, Mr. Dozortsev voluntarily surrendered on a complaint alleging that he conspired with his brother, Nicholas Dozortsev, and his brother's friend, Ricardo Fanchini, to launder money (18 U.S.C. § 1956[h]).  Mr. Dozortsev was indicted in January 2008.  Then, in August 2008, the indictment was superceded, adding two counts.  The first was marijuana possession with intent to distribute (21 U.S.C. § 841)[2].  The

---

[1] Mr. Dozortsev already paid $10,000 to the government as full restitution for health care fraud he committed in 2007.

[2] Agents recovered marijuana from Mr. Dozortsev's apartment, the weight of which appeared to be a distribution amount of one ounce.  The marijuana, however, was mistakenly weighed with the dish that contained it.  The actual weight was a user amount.  Mr. Dozortsev had suffered a marijuana addiction throughout his adult life.  *See* Exhibit B.  Fortunately for Mr. Dozortsev, with the help of counseling and the supervision of Pretrial Services in this case, Mr. Dozortsev has not used marijuana in almost three years.  The count was dismissed.

second count added in the superceding indictment was health care
fraud (18 U.S.C. § 1347).[3]

On November 11, 2008, Mr. Dozortsev accepted responsibility
for the money laundering conspiracy and health care fraud.

A.    *Money Laundering Conspiracy*

At the end of 2006, Mr. Dozortsev received into in
Manhattan a wire transfer of $600,000 and another of $400,000
from the wife of co-defendant Ricardo Fanchini.  The money was
intended to be used to invest in a parcel of land in
Pennsylvania and a gas station in New Jersey.  The $600,000 was
never used, however, as the land deal fell apart due to zoning
restrictions.  Mr. Dozortsev immediately returned the $600,000
transfer.  The $400,000 was used to invest in the gas station.

Mr. Dozortsev's brother, Nicholas, had a personal and
business relationship with Mr. Fanchini.  Initially, Mr.
Dozortsev was led by his brother to believe that Mr. Fanchini's
money and business dealings were legitimate.  Nicholas spoke
very highly of Mr. Fanchini not only to Arthur, but also to
their parents.

_____

3  Mr. Dozortsev's release on bond was revoked by Magistrate Judge Joan M. Azrack and he was placed
on home detention with electronic monitoring.  After nine months of home detention, the Court restored Mr.
Dozortsev to release on the conditions of his original bond.

4

Over the months following the two wire transfers, however, Mr. Dozortsev became suspicious of Mr. Fanchini.  Situations started to raise doubts about Mr. Fanchini's legitimacy.  For example, Mr. Fanchini's wife told Mr. Dozortsev not to refer to Mr. Fanchini by his surname, but, instead to refer to him by her last name, "Rotman".  She did not tell Mr. Dozortsev the reason; nor did he ask.

But Mr. Dozortsev's suspicions grew and created a high probability in his mind that the money transferred to his bank account was likely co-mingled with money derived from unlawful activity.

On November 10, 2008, three months after he was arraigned on the superceding indictment, Mr. Dozortsev accepted responsibility under a conscious avoidance theory of knowledge.

B.   *Health Care Fraud*

Mr. Dozortsev also accepted responsibility for having committed health care fraud.  Mr. Dozortsev allowed an application to be submitted for him by a family member to Medicaid which contained misinformation about his finances. Then he used his Medicaid card for doctors' visits and medicine in an amount of more than $10,000 but less than $40,000.  He has already agreed to the forfeiture of assets in the government's

5

possession (*see* Exhibit A), paid an additional $10,000 (*see* Footnote 1), and has entered into an agreement to repay the balance of the money owed to Medicaid.

C.   *Mr. Dozortsev's Growth Since His Arrest*

Because of Mr. Dozortsev's immoral, illegal, and downright stupid choices, he has suffered an arrest, felony convictions, a 9-month period of home confinement, damage to his business, and financial hardship.  But the almost three-year duration of this case has helped him grow as a person.

Initially, Mr. Dozortsev searched for someone, other than himself, to blame.  It was Mr. Fanchini's fault.  It was his brother's fault.  He made excuses for himself, adopting a "woe is me" attitude.

He then entered a phase of fear, during which he was scared to be part of such a serious federal indictment, worrying day and night about what that could mean to his future.  He panicked before each of the many court conferences, and remained anxious under the monitor of a Pretrial Services officer and supervision.

Mr. Dozortsev then entered a period of immense shame and remorse.  He was plagued by what he had done, and could barely eat or sleep.  He lost an unhealthy amount of weight, and became

6

ill.  Mr. Dozortsev needed medical assistance and was prescribed medication.  *See* Exhibit B.

Then, with the strong support of his father and the guidance of people such as his reverend and his rabbi, Mr. Dozortsev immersed himself in spirituality.  He openly admitted his wrongdoing to his family and friends, and received an outpouring of support.  Mr. Dozortsev's honesty and strong sense of spirituality helped him slowly but steadily begin a course of action to repair the damage he has caused.

Mr. Dozortsev will now come before the Court having accepted responsibility, and having made service to the community a part of his life.  He will show Your Honor how hard he has worked in his employment.  He has suffered forfeiture and has paid back the lion's share of the loss to Medicaid.  Mr. Dozortsev will come to court as an active synagogue and church parishioner, and will ask the Court to exercise its power to impose upon him a five-year sentence of probation with 250 hours of community service so he can continue being productive.

III. Sentencing Guidelines Calculation
Agreed Upon by the Parties

The United States Attorney's Office and I have discussed the application of the Guidelines to this case.  We will arrive

at the sentencing hearing agreeing that the appropriate adjusted
Guidelines level from which the Court should begin its
sentencing analysis is 15.  We appreciate the excellent work the
Probation Office does in investigating and completing its
Presentence Investigation Reports ("PSR").  The PSR in this case
is especially complicated, because the case history is
complicated.  Defendant Ricardo Fanchini operated an elaborate
and far-reaching scheme.  Most respectfully, however, the PSR
does not reflect Mr. Dozortsev's actual involvement, which was
very limited.

A.  *Conspiracy to Launder a Monetary Instrument*

     Mr. Dozortsev's base offense level is eight.  *See* U.S.S.G.
§ 2S1.1(a)(2).  Twelve levels should be added because the
intended monetary loss did not exceed $400,000.  *See* U.S.S.G. §
2B1.1(b)(1)(G).  Two levels should be added because Mr.
Dozortsev plead guilty under 18 U.S.C. § 1956.  *See* U.S.S.G. §
2S1.1(b)(2)(B).  Three levels should be subtracted for Mr.
Dozortsev's mitigating role in the offense, which was between
minor and minimal.  *See* U.S.S.G. § 3B1.2.  Three levels should
be subtracted because Mr. Dozortsev timely accepted
responsibility.  *See* U.S.S.G. §§ 3E1.1(a) and (b).  One level
should be subtracted because of the amount of time and resources

8

the government saved by the global disposition entered in this
case.  *See* U.S.S.G. § 5K2.0.  The total adjusted guidelines
offense level should be 15.  Mr. Dozortsev's Criminal History
Category is I.  His advisory sentencing guidelines range,
therefore, should be 18 to 24 months incarceration.

Mr. Dozortsev's plea agreement, however, allows him to ask
the Court to impose a non-Guidelines sentence based upon the
factors set forth in 18 U.S.C. § 3553(a).  *See* Exhibit A.

While the Probation Office contends that Mr. Dozortsev's
adjusted offense level is 32, due to the government's and our
acute understanding of Mr. Dozortsev's limited involvement and
knowledge in the conspiracy, we respectfully disagree with the
Probation Office's Guidelines calculations, and ask the Court to
begin its sentencing analysis at level 15, Criminal History
Category I.  *See* Exhibit C.


*B.  Health Care Fraud*

Mr. Dozortsev's base offense level is six with a four-level
guidelines increase because the monetary loss exceeded $10,000.
*See* U.S.S.G. §§ 2B1.1(a)(2) and 2B1.1(b)(1)(C).

The money laundering conspiracy count, not the health care
fraud count, should be applied for sentencing purposes, given

that the former yields a higher offense level than the latter. *See* U.S.S.G. § 3D1.4(a).

        IV.  We Suggest That a Term of Probation Would Be "Sufficient
             But Not Greater Than Necessary" to Satisfy The
                  Purposes of 18 U.S.C. § 3553(a)

The goals of sentencing can be achieved by a five-year maximum probationary sentence, 250 hours of community service, forfeiture, and restitution.

In 2005, district court judges regained their wide discretion to impose non-Guidelines sentences as long as they are reasonable.  *See United States v. Booker*, 543 U.S. 220, 226-227 (2005).  Following *Booker*, the Guidelines became effectively advisory.  *See Gall v. United States*, 552 U.S. 38, 62 (2007).  A year after the Supreme Court's decision in *Gall*, the Second Circuit took it upon itself to re-examine how courts in this circuit should conduct and review sentences in not only the post-*Booker* world, but specifically post-*Gall/Kimbrough*.  *See United States v. Cavera*, 550 F.3d 180, 184 (2d Cir. 2008).

The *Cavera* court's *en banc* opinion has expanded the sentencing court's discretion in imposing non-Guidelines sentences, and has limited the Second Circuit's own ability to challenge a sentencing court's determination.  It "is now [...] emphatically clear that the Guidelines are guidelines – that is,

10

they are truly advisory." *Cavera*, 550 F.3d at 184.  No longer
is there a presumption that a Guidelines sentence is reasonable.
The district court "must instead conduct its own independent
review of the sentencing factors, aided by the arguments of the
prosecution and defense."  *Id*.

Although the Guidelines remain a factor, district courts
must consider:

> (1)  the nature and circumstances of
> the offense and the history and
> characteristics of the defendant;
>
> (2)  the need for the sentence imposed
> to: (A) reflect the seriousness of
> the offense, to promote respect
> for the law, and to provide just
> punishment for the offense; (B) to
> afford adequate deterrence to
> criminal conduct; (C) to protect
> the public from further crimes of
> the defendant; and (D) to provide
> the defendant with needed
> educational or vocational
> training, medical care, or other
> correctional treatment in the most
> effective manner;
>
> (3)  the kinds of sentences available;
>
> (4)  the kinds of sentence and the
> sentencing range established for:
> (A) the applicable category of
> offense committed by the
> applicable category of defendant
> as set forth in the guidelines —
>
> [...]

11

> (6) the need to avoid unwarranted
>     sentence disparities among
>     defendants with similar records
>     who have been found guilty of
>     similar conduct; and
>
> (7) the need to provide restitution to
>     any victims of the offense.

*See* 18 U.S.C. § 3553(a).

We believe that in light of 18 U.S.C. § 3553(a)(1)-(7), and the efforts already made by Mr. Dozortsev and those anticipated, a non-Guidelines, non-incarceratory sentence would be sufficient and reasonable.

A.   *The Nature and Circumstances of The Offense (§ 3553[a][1])*

To add context to my analysis of the nature and circumstances of the offense, I offer a brief discussion of Mr. Dozortsev's life leading up to the instant offense.

Mr. Dozortsev enjoyed a promising career in his father's wholesale wine and spirits business, Dozortsev and Son's Enterprises. For the last ten years, Mr. Dozortsev, now age 38, has been responsible for gaining and maintaining accounts for the sale of wine. He works eight to ten hours each day, usually six days each week, going door to door to New York City restaurants and liquor stores trying to acquire them as customers. As of the time of his arrest, Mr. Dozortsev had

12

long-standing relationships with most of his clients, which numbered in the many hundreds.

Mr. Dozortsev also had been able to use his excellent credit score to buy apartments (one at a time) in Manhattan, reside in them as he improved their value, and then sell them each time for a profit.[4]

Given Mr. Dozortsev's then-successful business, and profitable personal real estate sales, one may wonder why Mr. Dozortsev committed these crimes. I believe it was less about thinking of ways to gain money, and more about simply choosing not to think. Mr. Dozortsev was raised in a strongly patriarchal family. He was taught to follow his elders rather than show independence. Consequently, Mr. Dozortsev was subservient to his older brother Nicholas, who is seven years Mr. Dozortsev's senior. Although Mr. Dozortsev had adequate experience in dealing with people, his brother always dominated him. From childhood through adulthood, whenever he tried to assert his individuality, Mr. Dozortsev would be stifled by his brother.

An incident that demonstrates this happened near the time of Mr. Dozortsev's arrest. He and Nicholas were discussing

---

[4]  As a result of the seizure of his leased 2007 Range Rover when Mr. Dozortsev was arrested in 2007, he lost the lease, and was forced to pay the $14,125 balance.  Although he satisfied the lease balance in a lump-sum payment, his credit was ruined.

family matters when Nicholas raised the subject of their
father's love for them.  He claimed that because he was not
their father's biological child, their father favored Arthur.
When Arthur told Nicholas that their father loved the two
brothers equally and that Nicholas' belief was wrong, Nicholas
assaulted Arthur.

Ever since the brothers were adolescents, Nicholas always
acted superior to Arthur, never treating him as an equal.  That
relationship continued until Nicholas' detention in this case
more than seventeen months ago.  Arthur also was stifled by
Nicholas in the family-owned business, as he always was forced
to "listen to Nicky."  Nicholas would resolve disagreements with
Arthur by screaming at him.  Shortly before Arthur's arrest, his
father finally tried to confront this problem and create
equality among the brothers within the business.  He failed.

In the summer of 2007, Nicholas approached Arthur with an
opportunity to become a partner in the intended purchase of a
gas station in New Jersey.  At that time, Mr. Dozortsev believed
that the funding for the deal was legitimate.  The problem for
Mr. Dozortsev was that Mr. Fanchini unlawfully acquired the
money, which was wired to Mr. Dozortsev's personal checking
account by Fanchini's wife.  Mr. Dozortsev did not want to
believe that his brother, who strongly vouched for Mr. Fanchini,

14

would jeopardize Mr. Dozortsev.  Notwithstanding Nicholas'
domination of Arthur, Arthur loved his older brother, and
Nicholas always protected Arthur from being harmed by others.
Consequently, Mr. Dozortsev ignored suspicions he developed
concerning Mr. Fanchini.

Mr. Dozortsev now comes before the Court almost three years
later, having learned a difficult, yet invaluable lesson about
himself and life.


*B.   Mr. Dozortsev's History and Characteristics (§ 3553[a][1])*

In 1974, when Mr. Dozortsev was two years of age, he and
his parents left growing signs of danger and religious
persecution in Ukraine, and began a new life in New York.

Avrohom Winner, a rabbi in our community, explains that
many Ukrainian families came to the United States because they
were unable to practice their faith due to "the persecution and
discrimination that the Soviet Union had on them."  Upon
arriving in the United States, "a country of religious freedom"
these people were excited to "openly be able to practice" their
beliefs.  *See* Exhibit D.

Mr. Dozortsev was raised by parents that stressed the
importance of sharing and helping those less fortunate.

15

Aleksandr Aksenov writes that when his family emigrated from Ukraine more than twenty years ago, Mr. Dozortsev's family "did everything possible for [Mr. Aksenov's] family to come to safety" in the United States.  He explains that Mr. Dozortsev and his family have helped many families like his."  *See* Exhibit D.

Longtime family friend Marty Markowitz shares a close friendship with Mr. Dozortsev's father.  Mr. Markowitz writes that in addition to growing a successful business, the elder Dozortsev "always [found] time to get involved in his local community, adopting many charitable causes addressing the needs of seniors, Holocaust survivors, local synagogues and community organizations."  *See* Exhibit D.

Similarly, Carl Kruger attests to the Dozortsev family's "history of service to [our] community" and how their assistance "has made a difference in many lives."  *See* Exhibit D.

Rabbi Mordechai Kanelsky, who heads an organization that "provides services, education and support to Jews from the former Soviet Union" has known Mr. Dozortsev and his family for more than twenty years.  He writes of the Dozortsevs' long-time support to his organization and how the family "will go out of their way to help others."  *See* Exhibit D.

16

As an adult, Mr. Dozortsev, himself, is widely regarded within his community as "an asset to his family and society." *See* Exhibit D.  Dozens of people from the community have contacted me to express their opinion of Mr. Dozortsev's reputation.  More than one hundred have written letters to the Court attesting to Mr. Dozortsev's history and characteristics. (*See* Exhibits D and E.)

Marina Kovalyov, who has known Mr. Dozortsev since he was a child, watched him "grow into a thoughtful and compassionate young man."  Mr. Dozortsev's "deep sense of pride and duty for his Jewish roots have steered him on a committed and dedicated path."  *See* Exhibit D.

Alexander Todd, who met Mr. Dozortsev when they were children in Ukraine, recalls that during a particularly difficult time in Mr. Todd's life, Mr. Dozortsev "was the only one there to take time and talk to [him] about everything going on in [his] life."  Mr. Todd went on to become the president of an aviation company and is married with a child.  He attributes his success to Mr. Dozortsev.  *See* Exhibit D.

Alexandre Grant describes a young Arthur Dozortsev as "warm hearted and ready to help anyone who needs help."  *See* Exhibit D.

Mark Davidovich, who has known Mr. Dozortsev since he was a child, describes Mr. Dozortsev as a "hardworking individual [and] family oriented." Mr. Dozortsev's "generosity and kindness has impacted many individuals in the most positive manner." *See* Exhibit D.

Regina Feldman credits Mr. Dozortsev for her courage to follow her dreams and start her own business. She writes that Mr. Dozortsev "instilled me with the confidence I needed" to "pursue [my] dream." Mr. Dozortsev has been "very positive and inspirational" and has the effect of making "you want to be a better person." *See* Exhibit D.

Anna Lev also recalls how her life has improved because of Mr. Dozortsev. Mr. Dozortsev helped her through a "very sad and difficult divorce." He has been a role model to her two young children and has given them "a sense of family and love [...] that they miss without their father around." *See* Exhibit D.

Similarly, Lana Wolkonsky remembers the help Mr. Dozortsev provided following her husband's death from cancer. After her husband died, her children were void of a male role model. Mr. Dozortsev spent "quality time" with her children during a difficult time, and "has always shown great concern for others." *See* Exhibit D.

18

Inna Kopelevich is an eighth-grade algebra teacher at an
inner-city school in South Central Los Angeles.  Mr. Dozortsev
has visited the school to speak with her students and share his
experience as a child who immigrated to the United States.  Mr.
Dozortsev has stressed the importance of hard work.  He is a
role model to the students who has taught them that they can
"achieve whatever they want to, as long as they are ambitious
[and] have clear goals."  *See* Exhibit D.

Perhaps more importantly, Mr. Dozortsev also has shared
with the children his "poor choices, and the devastating
consequences that he has endured.  He stressed the importance of
making the right choices in life."  *See* Exhibit D.

Mr. Dozortsev also helped Ms. Kopelevich launch a
charitable organization that provides financial aid, textbooks,
uniforms, and other assistance to underprivileged students.  He
"wants to be involved in changing the lives of these children,
many who – like him – are immigrants and face so many obstacles,
so that they can travel in a positive direction."  *See* Exhibit
D.

Robert Curran writes that the Happy Hearts Fund has
benefited from Mr. Dozortsev's help.  Happy Hearts Fund helps
children of natural disasters.  The Fund rebuilds schools and
provides medical care.  Mr. Dozortsev has traveled to Northern

19

Africa and South America to provide emergency supplies and help rebuild.  Mr. Curran describes Mr. Dozortsev as having been a "valuable" part of their relief team.  He notes that "children gravitate towards him because of [his] kind nature [...] He worked long hours under extreme conditions often foregoing food and sleep to bring comfort and relief to those in need."  *See* Exhibit D.

Ian Strafford-Taylor notes that Mr. Dozortsev has an extremely rare "generosity of spirit."  What "speaks even more eloquently about [Mr. Dozortsev's] character" is how "charitable and caring" he is to "people he does not know."  *See* Exhibit D.

Suzanna Mishiev explains that Mr. Dozortsev "treats everyone with the utmost respect" and "is always thinking of others and making sure everyone is taken care of. [...] His kindness and generous spirit comes as natural to him as breathing. [...]  The random acts of kindness that Arthur displays on a consistent basis are contagious.  Watching the reactions of appreciation and gratitude [...] is deeply moving and inspires [Ms. Mishiev] to do more for others."  *See* Exhibit D.

Gennady Katsov describes Mr. Dozortsev as "the first one to help during hard times [...] [I]f you are in need, he will be the first one to call and to come for help."  Mr. Dozortsev is

20

"always willing to sacrifice his time" to help "in an endeavor necessary for [the] community." *See* Exhibit D.

Similarly, Marisa Quagliarriello writes that "[n]ot only is he generous with family and friends, but he also gives to the homeless and assists the elderly in day-to-day situations." *See* Exhibit D.

These are only a fraction of the testimonials that speak to Mr. Dozortsev's history and characteristics.  His mistakes are no doubt serious.  But there also is no doubt that they are contrasted by a life filled with hard work and dedication to public commitment.

       V.  The Need for the Sentence Imposed to Reflect
        the Seriousness of the Offense, to Promote Respect
     for the Law and to Provide Just Punishment for the Offense

I urge the Court to consider that as the Court reflects upon the person being sentenced, a sentence of five years probation, 250 hours of community service, forfeiture and restitution will reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

Mr. Dozortsev's misconduct, for which he has accepted responsibility, was wrong.  He regrets what he did, and what he failed to do.  These mistakes, however, do not accurately

portray the person being sentenced.  They are inconsistent with

Mr. Dozortsev's lifetime of hard work and compassion.  Mr.

Dozortsev has proven his value to a society of people who,

notwithstanding his mistakes, admires and supports him.  The

more than one hundred community testimonials written to the

Court demonstrate that a non-incarceratory sentence will promote

respect for the law and provide just punishment to Mr.

Dozortsev.

     For example, Alec Brook-Krasny has known Mr. Dozortsev for

more than ten years.  Mr. Brook-Krasny considers Mr. Dozortsev a

"valuable member of our society," who is "dedicated to the

enrichment and well-being of [the] community."  *See* Exhibit D.

     According to Steven Zeidenfeld, Mr. Dozortsev is a "caring

and upstanding individual" whose character "inspires everyone

around him."  Our community "would suffer a great loss without

[Mr. Dozortsev] in our lives."  *See* Exhibit D.

     Alexander Eberlin, editor-in-chief of a local newspaper,

simply describes Mr. Dozortsev as a "great young man."  *See*

Exhibit D.

     George Vainer, who has known Mr. Dozortsev for almost

twenty years, knows Mr. Dozortsev as "compassionate" and

"understanding" and "the first to come to help the needy," who

22

if given the opportunity by this Court, would continue to
"tirelessly work to benefit the community."  *See* Exhibit D.

David Itskovich, an attorney in our community, believes
that Mr. Dozortsev has the ability to "learn from [his]
missteps."  *See* Exhibit D.

All of these members of our community who represent a
cross-section of society including those who serve us from
public office, houses of worship, educational institutions, and
all areas of the work force know how serious this case is.  All
of these people also know that the law carries the power to
punish Mr. Dozortsev by incarcerating him if necessary.  Yet all
of them urge the Court to consider that a person like Mr.
Dozortsev can better serve the community under the supervision
of probation while continuing to help those in need.

VI.  A Sentence of Probation Will Provide
Adequate Deterrence and Protect
the Public from Future Offenses by Mr. Dozortsev

We suggest that the requested sentence will achieve both
general and specific deterrence.

Such a sentence will demonstrate to the community that
engaging in illegal conduct will not be tolerated.  It will send
a message that we are required to investigate our engagements.
It sends a message that we cannot blindly trust our loved ones,

but must instead scrutinize those family members, as we would complete strangers.  I believe that requiring Mr. Dozortsev to comply with the mandates of the Probation Office for the next five years, and to complete 250 hours of community service, plus suffer forfeiture and pay full restitution sends a powerful message to the community.

As to Mr. Dozortsev, he admitted his wrongdoing and has worked hard to make amends for it.  He has undergone intensive counseling with Reverend Berliner, who has counseled inmates for more than fourteen years.  The Reverend notes that he is not "easily impressed or moved by human emotion," but instead looks for "real action from a person under [his] counsel."  According to Reverend Berliner, "Mr. Dozortsev has a clear understanding of his wrong actions and has displayed truly, a legitimate change of mind."  The reverend's hope is that a sentence of probation, with the condition of community service, will allow Mr. Dozortsev to "repay his debt to society" while serving the community in a more "useful way than incarceration."  *See* Exhibit D.

Peter Marinis, an attorney in our community who met Mr. Dozortsev through a charity fundraiser, explains that since his arrest, Mr. Dozortsev "has withdrawn from most social events [...] and has realized the gravity of his acts and has worked

hard to extricate and avoid any associations that may have led to his inappropriate conduct." *See* Exhibit D.

Irina Korobov, M.D., is a psychiatrist who had treated Mr. Dozortsev for depression and anxiety since his arrest almost three years ago.  Dr. Korobov notes that Mr. Dozortsev "constantly expressed a healthy and appropriate remorse for having involved himself with his brother.  He also regrets that he ruined his life and deeply disappointed his parents.  [He] is willing to do whatever it takes to right his mistakes."  In Dr. Korobov's professional opinion, "incarceration is healthy for some individuals, as they need to step back and re-evaluate their lives.  In Mr. Dozortsev's case, however, [she] firmly believe[s] that imprisonment may seriously affect his mental health and his chances of rehabilitation."  *See* Exhibit B.

I suggest that Mr. Dozortsev's remorse, positive efforts since his arrest almost three years ago, and history of community service demonstrate that Mr. Dozortsev is not likely to repeat his mistakes.

VII. Conclusion

On behalf of Mr. Dozortsev and his parents, I thank the Court in advance for taking the time to consider our sentencing submission. We look forward to addressing the Court at the sentencing hearing on September 29.

Dated: New York, New York
       September 23, 2010

                              Respectfully submitted,

                              S/ *Edward V. Sapone*
                              Edward V. Sapone (ES-2553)
                              Counsel for Defendant
                              Arthur Dozortsev

 cc: Steven L. Tiscione, Esq.
     Assistant United States Attorney